972 F.2d 343
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Anthony ROBINSON, a/k/a Tony, Defendant-Appellant.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Cleveland ROBINSON, Defendant-Appellant.
 Nos. 91-5414, 91-5415.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 6, 1992
Decided: July 22, 1992
 
 Argued: Lance Daniel Gardner, Gardner & Carter, Fairfax, Virginia, for Appellant Anthony Robinson; George Preston Doss, Jr., Alexandria, Virginia, for Appellant Cleveland Robinson. Victoria Boros Major, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 On Brief: Richard Cullen, United States Attorney, John P. Rowley, III, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 Before ERVIN, Chief Judge, CHAPMAN, Senior Circuit Judge, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Anthony Robinson and Cleveland Robinson, together with five codefendants, were charged in a 21 count indictment with various drug related crimes in violation of Title 21 U.S.C.ss 841(a)(1), 846, 848(a), 852, 860(a). Prior to trial, four of the codefendants entered pleas of guilty and agreed to cooperate with the prosecution. The fifth codefendant Diedre Baggett is a fugitive. Following a two day trial, Anthony Robinson was convicted of 13 counts, and Cleveland Robinson was convicted of 11 counts. These convictions included conspiracy to possess with intent to distribute more than 50 grams of cocaine, conducting a continuing criminal enterprise, possession with intent to distribute 36 grams of cocaine, distribution of crack cocaine to a person under 17 years of age, interstate travel in aid of racketeering and various distributions of crack cocaine.
 
 
 2
 Both appellants received sentences of life imprisonment on the continuing criminal enterprise charge and lengthy concurrent sentences on the other counts. The Robinsons have appealed and present six issues to this court. They claim error by the district court in:
 
 
 3
 (1) denying Anthony Robinson's motion to suppress evidence obtained at the time of his August 1, 1989, arrest;
 
 
 4
 (2) finding sufficient evidence to connect the ownership of a firearm to the conspiracy;
 
 
 5
 (3) deciding the issue of possession of firearms rather than submitting this issue to the jury;
 
 
 6
 (4) using the sentencing guidelines which are unconstitutional because they result in disproportionate sentences to black Americans convicted of drug offenses, particularly those involving crack cocaine;
 
 
 7
 (5) failing to grant judgment of acquittal on the continuing criminal enterprise count because the evidence was insufficient to prove that appellants supervised five or more persons; and
 
 
 8
 (6) calculating the amount of cocaine involved in the conspiracy for purposes of sentencing.
 
 I.
 
 9
 The testimony showed that the Robinsons had moved from New York City to Arlington, Virginia, in 1990 and began distributing large amounts of crack cocaine in an area of Arlington known as Green Valley. They aggressively recruited individuals to assist them, creating an organization employing over 30 people as street dealers, runners, overseers, sales representatives and couriers. Various persons who had worked for them testified as to the responsibilities of various employees and how they were controlled. There was also testimony of individuals, who had accompanied the Robinsons on trips to New York to purchase crack, that on each of these trips someone, other than the Robinsons, was always used to carry the cocaine back to Virginia, so if stopped, there would be no cocaine in the possession of the Robinsons. The courier carrying the drugs usually traveled by train and the Robinsons by automobile, but if the Robinsons did go 6350 35 2 by train, they would sit separately from the courier.
 
 
 10
 The DEA did not confirm the Robinsons' activities until late 1990 when it received a tip from a confidential informant. The agents learned on August 2, 1990, from a confidential informant that a female named DeeDee and a black male named Tony were distributing crack cocaine at a Lucky Seven Store. Based on this information, which included a good description of Anthony Robinson and DeeDee, including a description of their clothes and the automobile they were using, an officer located the Lucky Seven Store and found Tony Robinson and DeeDee to be present and dressed as the informant had said they would be. The officer approached DeeDee, whose name was Diedre Baggett, and Tony Robinson and searched them. He found a car key and a small amount of money on Robinson. The car key fit a blue rental automobile parked in front of the Green Valley Pharmacy. In the purse of DeeDee Baggett was a medicine bottle containing crack cocaine. The officer arrested both of these individuals and had them transported to the Arlington County Jail. He found the rental automobile with the license plate as it had been described to him. He then put the car under protection of another officer and obtained a search warrant for this vehicle. The search of the vehicle produced a gym bag of personal effects belonging to Anthony Robinson and a plastic bag containing a large amount of crack cocaine together with a pack of razor blades.
 
 
 11
 After his arrest, Anthony Robinson signed an advice of rights form at the Arlington County Police Department and advised the police that the cocaine was his property for personal use, and not for distribution. Robinson was released on bond, and the Northern Virginia Crack Task Force, comprising law enforcement officers from Alexandria, Fairfield County, Arlington County, Prince William County, and the DEA, began an extensive investigation of the Robinson drug activities. Joseph Marchi, a nine year veteran of the Arlington County Police Department, led the investigation. This agent coordinated eight controlled crack cocaine purchases from the Robinsons and their sales representatives over the course of seven months. These purchases totaled sixteen and one quarter ounces of crack cocaine in exchange for $18,700, and each transaction was observed by law enforcement surveillance and recorded on video and audio tape. Testimony included that of Ortez Hawkins, age 15, and Charlie Bea, age 17, who recounted crack cocaine purchases from the Robinsons. Furthermore, various individuals who worked for the Robinsons in the sale and transportation of crack cocaine also testified.
 
 II.
 
 12
 Anthony Robinson challenges the admission of the 36 grams of crack cocaine obtained in the search at the time of his arrest by Officer Dolan on August 2, 1990, arguing that the officer acted without probable cause. Appellant claims that all of the information available to Officer Dolan prior to his arrest of Anthony Robinson and DeeDee Baggett came from Agent Marchi and not from a reliable informant. Dolan testified that the information probably came from an informant, but there is no indication of the informant's identity, his reliability or anything else that would lend credence to him or any information furnished by him.
 
 
 13
 The district court did not conduct a suppression hearing on this evidence, because no request was made until the trial had commenced and Officer Dolan was in the midst of his direct examination. The court had entered a pretrial order on May 6, 1991, which required all pretrial motions to be filed by May 16, 1991, and be heard June 7, 1991.
 
 
 14
 No suppression motion was filed by Anthony Robinson even though he was aware that Count 4 of the indictment charged him with possession with intent to distribute the 36 grams of crack seized on August 2, 1990, the date of his arrest. The defendants were provided with the opportunity to review all physical evidence in possession of the prosecution prior to trial.
 
 
 15
 Federal Rule of Criminal Procedure 12 covers pleadings and motions prior to trial and subparagraph (f) states:
 
 
 16
 Effect of Failure to Raise Defenses or Objections. Failure by a party to raise defense or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.
 
 
 17
 Fed. R. Crim. P. 12(f). A motion to suppress is covered by this rule, and the appellant was clearly on notice of the necessity of making suppression motions under the terms of the court's pretrial order of May 6, 1991. In United States v. Wilson, 895 F.2d 168, 173 (4th Cir. 1990), we made clear that the defendant has an obligation to raise issues by the dates set by the trial judge in his pretrial order. The trial judge did not abuse its discretion in denying the appellant's effort to obtain a suppression hearing in the middle of the trial when the appellant was on notice that any suppression motion should have been filed by May 16, 1991. The district court's denial of a request for relief from a waiver may be disturbed on appeal only if it is clearly erroneous. We find no clear error in the district judge's refusal to grant relief under Rule 12(f) on the present facts.
 
 III.
 
 18
 Both appellants challenge the district court's two level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon. They claim that there was not sufficient evidence in the record to connect a weapon to either appellant during the commission of any crime for which they were convicted. They also claim their sixth amendment right to a jury trial and their fourteenth amendment right to proof beyond a reasonable doubt were denied by the prosecution's decision to submit the weapon possession issue to the court as a sentencing factor in lieu of charging the substantive offense under 18 U.S.C. § 924(c).
 
 A.
 
 19
 The district court found that the defendants used firearms in the commission of the continuing criminal enterprise offense. This finding of fact is supported by the testimony of Lisa Mason, a girlfriend of Cleveland Robinson, who testified that Cleveland Robinson kept three firearms in a shoe box in her apartment. Cleveland Robinson also lived in the apartment and kept drugs there. This finding of fact may only be disturbed if it is clearly erroneous, United States v. White, 875 F.2d 427, 431 (4th Cir. 1989), and from an examination of the record we cannot say that this finding is clearly erroneous.
 
 
 20
 Cleveland Robinson argues that there is no evidence that he carried a weapon during the commission of any of the crimes charged in the indictment; however, possession of a weapon on one's person is not necessary. We have held that enhancement under § 2D1.1(b)(1) does not require "precisely concurrent acts." United States v. Johnson, 943 F.2d 383, 386 (4th Cir.), cert. denied, 60 U.S.L.W. 3435 (1991). Johnson affirmed an enhancement based upon the storage of firearms and drugs at a codefendant's residence and held that"[t]he proof need only show that [a defendant] possessed the weapons 'during commission of the offense.' ... 'during the commission of' is not so construed narrow in its meaning." Id.
 
 
 21
 The enhancement was made to the continuing criminal enterprise offense and not as to the drug sales separately charged in the indictment. Among the offenses used to establish the continuing criminal enterprise was conspiracy to possess crack cocaine with intent to distribute. The firearms were possessed with the drugs in the same residence, and therefore the firearms were "possessed during the commission of the offense." U.S.S.G. § 2D1.1(b)(1).
 
 
 22
 As to Anthony Robinson, the trial judge found that he had arranged for female employees of the drug organizations to carry firearms and have them available in the areas where he was distributing crack. This information did not come from testimony at the trial but was contained in the presentence report which the court found to be true. The appellant was on notice of this claim and was given an opportunity to respond to it. Because Anthony Robinson failed to respond and the district court's finding is not clearly erroneous, we uphold the court's decision.
 
 B.
 
 23
 There is no merit to appellants' claims that the prosecution's decision not to charge them with substantive violations of 18 U.S.C. § 924(c) but to seek enhancement for possession of a firearm during the commission of a drug offense pursuant to U.S.S.G. § 2D1.1(b)(1) violates their sixth and fourteenth amendment rights. We rejected this argument in United States v. Bowman, 926 F.2d 380 (4th Cir. 1991). The United States Attorney has the responsibility to decide which charges to present to the grand jury. The rights of the defendant at sentencing are different from his rights at trial, and a sentencing court has "wide discretion in the sources and types of evidence used to assist [it] in determining [the sentence]." Williams v. New York, 337 U.S. 241, 246 (1949).
 
 As we stated in Bowman:
 
 24
 This does not mean, however, that a defendant has no due process rights at sentencing. He clearly has a right not to be sentenced on the basis of "misinformation of a constitutional magnitude." United States v. Tucker, 404 U.S. 443, 447 ... United States v. Beaulieu, 893 F.2d 1177 (10th Cir. 1990). "This right is protected by the requirement that the defendant be given adequate notice of and an opportunity to rebut or explain information that is used against him." United States v. Beaulieu, 893 F.2d [at] 1181.
 
 
 25
 Bowman, 926 F.2d at 382 (1972). The Robinsons were both put on notice that firearms possession would be used at sentencing. This notice was adequately given by the probation officer in the presentence report. The Robinsons were afforded the opportunity to rebut the firearms information in stating their position with respect to the sentencing factors and at the sentencing hearing.
 
 IV.
 
 26
 Appellants argue that the sentencing guidelines are unconstitutional because they impose a significantly more severe punishment for the distribution of crack cocaine than they do for the distribution of powder cocaine, and this imposes a disproportionate punishment on blacks, who are the primary distributors and users of crack. It is claimed that whites are the primary users of powder cocaine and that equal amounts of the two illicit drugs result in much more lenient treatment of distributors and users of powder cocaine under the sentencing guidelines. The Robinsons are black, and they rely on a recent opinion of the Minnesota Supreme Court, Minnesota v. Russell, 477 N.W.2d 886 (Minn. 1991).
 
 
 27
 We do not find the reasoning of the Minnesota Supreme Court persuasive. That court used what it called "a rational basis" test to examine the Minnesota drug statute, and the opinion states that this rational basis test is more strict than the federal standard. The federal standard is equal protection, and absent purposeful discrimination "differential impact is subject only to the test of rationality." Rogers v. Lodge, 458 U.S. 613, 617 n.5 (1982). Purposeful discrimination has not been shown. It is common knowledge that crack is very addictive, much more addictive than powder cocaine. In United States v. Thomas, 900 F.2d 37 (4th Cir. 1990), we considered the rationality of the different treatment of crack cocaine from powder cocaine and concluded:
 
 
 28
 We find that Congress could rationally have concluded the distribution of cocainebase is a greater menace to society than distribution of cocaine powder and warranted greater penalties because it is less expensive and, therefore, more accessible, because it is considered more addictive than cocaine powder and because it is specifically targeted toward youth.
 
 
 29
 Id. at 39-40.
 
 V.
 
 30
 Appellants challenge their convictions under 21 U.S.C. § 848(a) of operating a continuing criminal enterprise and argue that this count of the indictment should not have been submitted to the jury because there was not sufficient evidence to sustain a conviction thereunder. Their primary claim is that the evidence does not support a finding that they supervised five or more individuals. Section 848(c) provides:
 
 
 31
 (c) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if-
 
 
 32
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 
 
 33
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter-
 
 
 34
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 
 
 35
 (B) from which such person obtains substantial income or resources.
 
 
 36
 21 U.S.C. § 848(c).
 
 
 37
 Both Anthony Robinson and Cleveland Robinson argue that there were no more than four persons shown by the evidence to have been supervised by or subject to their direction. They assert that these are: Kevin McDougal, who sold crack for both Robinsons; Eddie Smith, who helped Cleveland Robinson in multiple sales to Officer Cleveland Spruill; Lisa Mason, who worked for both Robinsons, and Stephanie Blount, who sold crack for Anthony Robinson. They claim that no other individuals were supervised, although others made drug purchases from them.
 
 
 38
 The record supports a finding that both Anthony and Cleveland Robinson supervised five or more other persons and that they also occupied a position of management in the drug organization. Kevin McDougal testified about three other people whom he knew worked for the Robinsons in the selling of crack cocaine. He gave their names as "Bodis, Margaret and Duck," and testified that they sold "$20 rocks" of crack. It is common in the drug business to identify individuals by nicknames or first names without the use of last names. McDougal also testified that one Michael Orr worked for Anthony Robinson as a driver and delivery person.
 
 
 39
 Richard Graves testified that Harry Boid was employed by the Robinsons as an "overseer" and that he (Graves) held the same type position with the Robinson organization. Graves also testified that Cleveland Robinson was a manager of the business and identified a manager as one who took care of the money, watched people distributing the crack and made sure that they brought back the correct amount of cash after a sale. He stated that this is what Cleveland Robinson did. Graves also identified "Ruth, Coco, Duck, Margaret and Sharkey" as runners for the Robinsons.
 
 
 40
 Lastly, Lisa Mason testified that she was an employee of the appellants and identified six runners, and also Michael Orr and Kevin McDougal as working for the organization.
 
 
 41
 In viewing the evidence in the light most favorable to the government as we are required to do under Jackson v. Virginia, 443 U.S. 307, 319 (1979), we can only conclude that a rational trier of the facts could have reasonably concluded that both Cleveland and Anthony Robinson occupied a position of management and supervised at least five other persons in conducting their drug business.
 
 VI.
 
 42
 Appellants challenge the district court's determination of the quantity of drugs attributed to the conspiracy and to the continuing criminal enterprise. They claim that only the quantity of drugs that is supported by evidence presented at trial may be considered by the sentencing court in calculating the guideline range. They contend that the prosecutors informed the probation officers for Anthony Robinson and Cleveland Robinson as to the amount of drugs without the knowledge or advice of defendants' attorneys or the test of crossexamination. The probation officers advised the district court that "at least 5 KG but less than 15 KG of cocaine base was involved," and this produced a base offense level of 40. U.S.S.G.s 2D1.1(c)(2).
 
 
 43
 At sentencing, appellants argued for a base offense level of 36 representing "[a]t least 500 G but less than 1.5 KG of cocaine base," U.S.S.G. § 2D1.1(c)(4), which is the maximum they contend the trial evidence will support. The district court found a base offense level of 38 based upon a finding of "at least 1.5 KG but less than 5 KG of cocaine base." Appellants argue that the sentencing judge "double counted" some of the drugs and that, in arriving at its conclusion, the court should have calculated only the total grams sold. As an alternative, the Robinsons suggest that the court should have considered only the drugs proved to have been brought to Virginia from New York.
 
 
 44
 The district court's finding of fact as to the amount of drugs attributable to the Robinsons is reviewed under a clearly erroneous standard. United States v. Mark, 943 F.2d 444, 450 (4th Cir. 1991). The findings of fact at sentencing, unlike those that establish guilt, may be proved by only a preponderance of the evidence. United States v. Engleman, 916 F.2d 182, 184 (4th Cir. 1990).
 
 
 45
 We cannot say that the district court was clearly erroneous in its findings as to drug weight. The court concluded as follows:
 
 
 46
 My calculation of the quantity starts out with the 462 grams that were introduced at trial. McDougal's ... seven or eight trips to New York to pick up from two ounces to an eighth on each trip probably gets you another half to one kilogram. Mason made two trips, and while she was not specific as to the amount, it's fair to infer it seems to me that she got an eighth on each trip, and McDougal again testified as to a half-kilogram sale to four others, and there was another witness who testified that he was selling $1,000 a day worth.
 
 
 47
 Now, that's pretty unspecific, but I think that it comes up to more nearly one-and-a-half kilos than it does to the five that the Government asserts is the proper amount from which to calculate the guideline level.
 
 
 48
 The testimony of sales of $1,000 per day came from Kevin McDougal, who stated that he sold this amount every day for approximately four months. Based on the total monetary receipts from this source alone, and with testimony as to the costs per gram of crack, the court could find 2,576 grams (2.56 kilograms). The court out of leniency, or a desire to prevent the possibility of double counting, found a total of from 1.5 to 5 kilograms.
 
 
 49
 In addition to McDougal's sales, the court heard the testimony of various witnesses about trips to New York to buy crack, various purchases and sales of crack, and the 462 grams introduced at trial. The district court's finding as to amount is not clearly erroneous and from our review of the record seems quite fair to the appellants.
 
 
 50
 For the reasons stated above, the convictions and sentences of the appellants are affirmed.
 
 AFFIRMED